466 So.2d 480 (1985)
SIMS-SMITH, LTD.
v.
Betty Lou STOKES.
No. 84-CA-184.
Court of Appeal of Louisiana, Fifth Circuit.
February 11, 1985.
Rehearing Denied April 17, 1985.
*481 Middleberg & Riddle, Don C. Gardner, Metairie, for plaintiff-appellee.
Robert R. Boland, Jr., Baton Rouge, for defendant-appellant.
Before BOUTALL, CHEHARDY and KLIEBERT, JJ.
CHEHARDY, Judge.
This is a suit for breach of contract for personal services. The district court ruled in favor of plaintiff, a corporation that operates a lingerie shop. Defendant, who contracted to advise plaintiff in the development, opening and establishment of the store, has appealed.
Sims-Smith, Ltd., through its incorporators James Sims and Joan Sims, sought the assistance of Betty Lou Stokes in opening a retail women's lingerie shop in Lakeside Shopping Center in Metairie, Louisiana. Mrs. Stokes has opened a number of women's shops around the state, and at the time relevant hereto was operating a lingerie shop in Baton Rouge. After preliminary discussions, the parties drew up and signed a contract for personal services, under which Mrs. Stokes was an independent contractor.
The contract was for a six-month term, commencing on October 21, 1981 and ending 180 days thereafter. The contract provided *482 for a payment of $7,500 by Sims-Smith to Stokes upon execution of the contract, and for another payment of $7,500 to be made 90 days later.
The contract divided Mrs. Stokes' obligations into three time periods:
Prior to the store's opening, she was to attend a garment purchasing market with the Simses to purchase inventory for the shop. She was to assist in setting up displays and merchandise. She was to instruct on "methods of ordering, purchasing, display, inventory, re-ordering, sizing for ordering" and "procedures for cash flow management."
Her responsibilities following opening were, during the first and second weeks, to "train personnel" and "work minimum two days," each week thereafter "minimum of one day," "be available for telephone calls during working hours of the Metairie Store," and at three months "review operation of the store more particularly but not limited to ... bookkeeping, inventory, control, management and buying techniques." The contract also provided, "The above shall be done in Metairie Store for a minimum of three days." Significantly, following each provision specifying the minimum days Stokes had to work, there is a handwritten addendum, "unless both parties agree otherwise," initialled by Joan Sims and Betty Stokes.
During the third through sixth months, her responsibilities were to be available for telephone calls during working hours of the Metairie store. Finally, the contract provided that Stokes would attend a total of three buyers' markets.
The first $7,500 payment was made and Mrs. Stokes accompanied the Simses to a buyers' market in Dallas in October 1981. She placed merchandise orders for their shop and arranged for the orders to be expedited so the shop could open in time for the 1981 Christmas season. Mrs. Stokes spent two days in Metairie before the shop opened, assisting in setting up the displays. Thereafter she was in regular contact with Mrs. Sims by telephone, but returned physically to Metairie only once. The Sims-Smith, Ltd., shop, named Jennifer's, opened on November 23, 1981. According to the testimony of both sides, the shop had a successful Christmas selling season.
On January 11, 1982, about two weeks before the second $7,500 payment was due, Sims-Smith, Ltd., sent a letter to Mrs. Stokes, advising her she had breached the contract and demanding return of the $7,500 already paid her. Mrs. Stokes received the letter on January 14, but did not respond.
On July 27, 1982 Sims-Smith filed this lawsuit, alleging that Mrs. Stokes had failed and refused to perform her part of the contract and that plaintiff had suffered loss of business and/or profits as a result. Plaintiff sought return of the monies paid defendant as well as damages in the amount of $50,000.
Mrs. Stokes answered by general denial and filed a reconventional demand, seeking the remainder of the fee due her under the contract as well as payment of her unreimbursed travel expenses.
Sims-Smith later filed a supplemental and amending petition, alleging that Mrs. Stokes owed $773 on open account. She had purchased merchandise from Jennifer's for which she had paid by check but she stopped payment on the check after receiving the letter cancelling the contract. In her answer, Mrs. Stokes denied that she was liable personally for the merchandise and asserted that she had purchased the merchandise on behalf of Garbo's of Lafayette (a store owned by her son).
After trial on the merits on August 31, 1983, the district court ruled in favor of Sims-Smith. In reasons for judgment, the court concluded, "[T]here was never a meeting of the minds as to what was the intent or meaning of the phrase `unless both parties agree otherwise,' thus there was no contract." The court found, however, that Mrs. Stokes was entitled to be paid on a quantum meruit basis for the duties she actually performed and found *483 the value of her services to be $4,000.[*] Accordingly, the court awarded Sims-Smith $3,500 as the amount to be returned by Mrs. Stokes out of the original $7,500 payment. In addition, the court found Mrs. Stokes liable for $773, the value of the merchandise she purchased from Jennifer's. Mrs. Stokes' reconventional demand was dismissed. She filed a suspensive appeal.
On appeal, Mrs. Stokes contends the court erred in finding there was no meeting of the minds as to the phrase "unless both parties agree otherwise" and in finding there was no contract; in valuing defendant's services at only $4,500 and in refusing to accept expert testimony regarding the value of those services; and in finding defendant liable for the $773 in merchandise. Finally she contends the court erred in its mathematical computations of the judgment amount.
There is no dispute that Mrs. Stokes did not work at plaintiff's store the minimum days specified in the contract. Her defense is that plaintiff, through its stockholderstore manager Joan Sims, agreed to her absence. Mrs. Stokes testified she remained in Baton Rouge because her daughter was going through a difficult pregnancy, delivery and post-partum recovery during the relevant time period. Mrs. Stokes maintains that her daughter's condition was the reason she insisted on having the escape clause"unless both parties agree otherwise"inserted in the contract. She insists that Joan Sims (who managed Jennifer's and who was Mrs. Stokes' primary contact with plaintiff) knew why defendant could not travel from Baton Rouge to Metairie during this time and that Joan Sims never objected to her absence, but rather seemed understanding and agreeable. Further, Mrs. Sims only once specifically asked Mrs. Stokes to travel to Metairie.
Joan Sims testified she had put the clause in the contract at Stokes' insistence and that the reason Stokes gave her was simply "in case things came up." Mrs. Sims denied knowing specifically what Mrs. Stokes meant by "in case things came up." Mrs. Sims said it was her understanding that if something came up, they would both agree for Mrs. Stokes not to come.
The difficulties in this case arise from the parties' differing interpretations of what constituted the agreement of both parties. Mrs. Stokes interpreted Mrs. Sims' silence and lack of verbal objection to her absence as being agreement. Mrs. Sims interpreted the phrase to mean that on each occasion Stokes was expected to travel to Metairie, she and Stokes were required to agree specifically and openly that Stokes could be absent.
Legal agreements have the effect of law upon the parties and none but the parties can abrogate or modify them. Courts are bound to give legal effect to all such contracts according to the true intent of all the parties. The intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences. It is the common intent of the parties that is to be sought; if there was a difference in intent, there was no common consent and consequently no contract. LSA-C.C. art. 1945.
As the trial judge obviously found, the phrase at issue here, "unless both parties agree otherwise," is ambiguous. The ambiguity arises not so much because "agree" is undefined but rather because the contract does not delineate how such agreement between the parties is to be expressed. Nor can the meaning of that phrase be ascertained by reference to the rest of the contract. See LSA-C.C. art. 1948.
When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed *484 by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation LSA-C.C. art. 1956; Con-Plex, Div. of U.S. Indus. v. Vicon, Inc., 448 So.2d 191 (La.App. 1 Cir. 1984).
When the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity and show the intention of the parties. Quintana Petroleum Corp. v. Alpha Inv. Corp., 435 So.2d 1092 (La.App. 1 Cir.1983).
Here, the testimony of the parties made clear that Mrs. Stokes would not have signed the contract if the escape clause had not been included. Mrs. Sims understood the purpose of the clause to be in the event of occasional unexpected interferences. Mrs. Stokes called her the first week the store was open and said she could not come because her daughter was going to have a baby and her son was taking over a store in Lafayette and they needed her. Mrs. Sims testified she tried to be understanding about it, but never intended that Mrs. Stokes would be absolved of all her duty under the contract to appear at the Metairie store.
After the second week the store was open, Mrs. Stokes came one other time, December 7, at Mrs. Sims' express request. Other than that, their only communication was by telephone. Mrs. Stokes repeatedly mentioned to Mrs. Sims during their telephone conversations that her daughter was having a hard pregnancy and she needed to be with her. Mrs. Sims testified she tried to be understanding each time but kept thinking that perhaps Mrs. Stokes would come the next day. She considered it highly important to have Mrs. Stokes present in the store during the early stages, to supervise floor activity of the employees. Mrs. Sims said she never specifically told Mrs. Stokes she did not have to come in.
Mrs. Stokes informed Mrs. Sims she could not come into town during Christmas week because she had to be in her own store during that time, it being the busiest week of the year. Mrs. Sims, by her own testimony, clearly acquiesced to that absence.
Mrs. Sims was out of town for a few days over the Christmas holidays. After she returned she and Mrs. Stokes had several more telephone conversations, but by this time Mrs. Sims was upset at Mrs. Stokes' continued failure to appear at the store and was brief with her on the phone. Mrs. Sims' final conversation with defendant was in January, by which time Mrs. Sims and her husband had already decided to terminate the contract. However, Mrs. Sims never specifically told Mrs. Stokes of her dissatisfaction.
(Although he testified at length at the trial, Mr. Sims was not directly involved in the store operations, other than negotiating the financial aspects of the contract and supervising construction of the interior of the store.)
Mrs. Stokes testified she was lulled into believing that she would not be required to work in the Metairie store as required by the contract because Mrs. Sims never specifically expressed dissatisfaction with her non-appearance. Instead Mrs. Sims told her a number of times that she was doing a good job. Mrs. Stokes also testified in detail to the advice and assistance she gave plaintiff during the buyers' market in October and during the time preceding the store's opening.
Mrs. Stokes stated she had "an understanding" with Mrs. Sims; she told Mrs. Sims that her daughter was having a baby and that she would not be able to come for a week or so after the baby was born and that she would not be able to come during Christmas week. She indicated Mrs. Sims had told her that if she needed her she would call her. It is obvious that Mrs. Stokes felt Mrs. Sims' understanding attitude absolved her from the letter of her duties under the contract. Mrs. Stokes apparently considered her frequent *485 telephone conversations adequately replaced her presence at the Metairie store. The duty of good faith, however, does not require a party to a contract to remind the other party of his contractual duties. Louisiana Power & Light Co. v. Mecom, 357 So.2d 596 (La.App. 1 Cir.1978).
In view of the testimony, we cannot say the trial judge was clearly wrong in concluding that the parties did not have a "common intent" as to the meaning of the phrase "unless both parties agree otherwise." Thus we cannot say the trial judge erred in finding the contract null.
Further, even if we were to hold the contract was not null we would find under the evidence that it was terminated by mutual agreement between the parties following plaintiff's January 1982 letter to defendant. Defendant's silence and inaction upon being informed the contract was at an end constituted an implied concurrence in its dissolution. See Allan v. Arnold, 673 F.2d 767 (5 Cir.1982); Bruhl v. White, 346 So.2d 734 (La.App. 1 Cir.1977).
Plaintiff-appellee has not contested the quantum meruit award to defendant. The only issue regarding the award is its amount, which defendant contends is (1) too low and (2) confused in the mathematical calculations of the trial court.
We have already discussed, in the footnote earlier in this opinion, the typographical error upon which defendant bases her contention that the amount of the award is $4,500 rather than $4,000. We think it clear that the judge intended the award to be $4,000. The question remains whether that is too low for the services rendered.
We find no error in the trial judge's refusal to qualify as an expert the witness defendant offered to prove the value of her services. That individual, Ms. Ashley Burkes, had several years of experience in running a retail lingerie shop but had no formal training in marketing or management. The acceptance or rejection of an expert witness is a matter within the discretion of the trial judge. We find no abuse of that discretion.
Reviewing the testimony relating to Mrs. Stokes' work, both in relation to the work actually performed and the work delineated in the contract, we find $4,000 to be a fair award. See Fullerton v. Scarecrow Club, Inc., 440 So.2d 945 (La.App. 2 Cir.1983).
Finally, we find no error in the trial judge's finding Mrs. Stokes liable for the merchandise purchased from Jennifer's for her son's store in Lafayette. Although she contends plaintiff should have sued Garbo's of Lafayette directly, it is plain from the testimony that Mrs. Stokes' words and actions at the time she purchased the items implied she would pay personally for them. Generally speaking, an agent is not responsible to third persons where his principal is disclosed, but the agent may make himself personally liable if he expressly or impliedly pledges his own responsibility. Weeden Engineering Corp. v. Hale, 435 So.2d 1158 (La.App. 3 Cir.1983).
For the foregoing reasons, the judgment of the district court is affirmed.
AFFIRMED.
NOTES
[*] We note there is a discrepancy; in one place in the reasons for judgment, the value of Mrs. Stokes' services is shown as $4,500, but in another place it is shown as $4,000. The judgment itself lists the amount to be paid by Mrs. Stokes to plaintiff as $3,500, thereby implicitly setting the value of her services at $4,000. We conclude the $4,500 figure was a typographical error.